## HOMESTAKE MIN. CO. v. FULLERTON.

(Circuit Court of Appeals, Eighth Circuit. September 16, 1895.)

### No. 537.

1. NEGLIGENCE—QUESTION FOR JURY.

In an action for personal injuries, it appeared that plaintiff, one F., was employed by the H. Mining Co., as engineer, to operate the engine which drove shafting in a tunnel in the mine, and to see that the bearings of the shafting were properly oiled. The shaft ran in a narrow and dark tunnel, supported on timbers which were placed at such a height as to make it necessary to stoop under them to reach the several bearings; and it was formed of two pieces, which were coupled together, at a distance of about 12 inches from one of the supporting timbers, by nuts and bolts which projected from the shaft. F. was examining the bearing of the shaft while it was revolving rapidly, and, when in the act of rising to an upright position, after stooping under the supporting timber, was caught by the projecting bolts, whirled round the shaft, and seriously injured. There was some evidence that F. was not required to pass through the tunnel, or examine the bearings, while the machinery was in motion; that he might have reached the point to which he was going by a safer route; and that he was careless in rising from under the timber near the coupling. But there was also evidence that F. was required to examine the bearings, and that he went to the place by the usual way. *Held*, that the questions of the negligence of the mining company, and the contributory negligence of F., were for the jury, and that it was not error to refuse to instruct the jury that the latter was, and the former was not, established.

2. MASTER AND SERVANT—RISKS OF EMPLOYMENT.

It also appeared that one T. was the foreman of the H. mine, which was owned by a corporation having large interests in sundry places under the general charge of a superintendent; that T. had power to hire and discharge men, direct their work, and generally to control all the ordinary daily operations at the mine, and on one occasion, upon complaint of F., had promised to remove a dangerous obstruction in the tunnel, and had afterwards caused it to be removed. There was evidence that F. had complained to T. of the danger from the projecting bolts on the revolving shaft, and that T. had promised, a few days before the accident, to have the coupling covered with a box, for protection. *Held*, that it was within the apparent scope of T.'s authority to promise to make the coupling safe, and that F. did not, by continuing in the company's employment in reliance on such promise, assume the risks arising from the dangerous position of the coupling.

3. SAME—DUTY TO FURNISH SAFE APPLIANCES.
    *Held,* further, that the rule that a master is not bound to replace an appliance, such as is in common use, because it is possible to get a better one, did not apply to relieve the H. Co. from the duty of protecting the exposed coupling by putting a suitable guard around it.

4. EVIDENCE—CROSS-EXAMINATION.
    F. having been asked, on cross-examination, whether he had been told by his counsel that his whole case depended on his swearing that he had complained to T., and having answered "No," was asked whether he did not know that his whole case depended on his so swearing. The court excluded the question. *Held* no error.

In Error to the Circuit Court of the United States for the District of South Dakota.

This was a suit in which William Fullerton, the defendant in error, sued the Homestake Mining Company, the plaintiff in error, in the circuit court of the United States for the district of South Dakota, for personal injuries sustained by him while working as an engineer for the defendant company at its mine near Lead City, in the state of South Dakota. The material facts, other that those hereafter mentioned in the opinion, which the evidence tended to establish, are as follows: For two years and two months prior to February 3, 1890, the plaintiff had been in the employ of the defendant company, in various capacities, at its mines in the state of South Dakota. On the latter date he had charge of a stationary steam engine which supplied the power to run a Gate's rock crusher. This crusher was located underneath the ground at the west end of a tunnel, some six feet wide by seven feet high, which had been excavated through solid rock. Power was communicated to the Gate's crusher by means of a line shaft some four inches in diameter, which ran from east to west lengthwise of the tunnel, and was supported at six points by timbers or supports placed crosswise of the tunnel, to the tops of which were bolted suitable metal bearings to carry the shaft. The shaft was about 30 feet long, and at the east end thereof were two pulley wheels, which were fastened to the shaft. The stationary engine was located some distance to the south of the east end of the shaft, and on a higher plane. A belt descending on an incline from the fly wheel of the engine passed around one of the aforesaid pulley wheels, and turned the line shaft at the rate of about 250 or 300 revolutions per minute when the Gate's rock crusher was in full operation. The other pulley wheel attached to the shaft was used, as it seems, to communicate power, by means of another belt, to another rock crusher, that was located some distance north of the line shaft. The line shaft was composed of two sections, of about equal length, which were coupled together, by means of nuts and bolts, at a point within the tunnel not more than 12 inches from one of the cross timbers which supported the shaft. The shaft was laid about in the center of the tunnel, and was elevated for some distance above the floor by means of the cross timbers or supports on which it rested. It was a part of the plaintiff's regular duty, as engineer in charge of this engine, to see that the journals of the Gate's rock crusher, and that all the bearings in which the line shaft turned, were kept properly oiled. When the accident occurred this was a duty which necessitated a frequent examination of the metal bearings supporting the line shaft, as the shaft was new, and had only been placed in position about a month previous to the accident, for the purpose of operating the Gate's crusher. The Gate's crusher was also a new piece of machinery. The plaintiff took charge of the engine which ran the Gate's crusher on January 11, 1890. Part of the time between January 11, 1890, and February 3, 1890, he had worked on the day shift, and part of that time on the night shift. He had also been off duty for some days during the same period, on account of illness. On the morning of February 3, 1890, the plaintiff oiled the journals of the crusher and the bearings of the line shaft, and then started the engine. Shortly afterwards he went into the tunnel again for the purpose of examining the machinery while it was in motion, and especially for the purpose of examining the bearings of the line shaft. To reach these bearings he descended from the engine room on an

incline alongside of the belt leading from the engine to the line shaft, then turned at right angles into the tunnel and walked by the side of the shaft in the direction of the crusher, examining each bearing as he approached it. When he reached the bearing in close proximity to the coupling, he found it necessary to stoop or crawl underneath the cross timber which supported the shaft. He was at the time incumbered with his lantern and some material for oiling the bearings. As he was in the act of rising to an upright posture, after stooping or crawling underneath the timber, his clothing was caught by the protruding bolts in the coupling, and he was rapidly whirled around the shaft, his lower extremities coming in contact with the rock floor of the tunnel at each revolution of the shaft. As a result of the accident the plaintiff lost both of his feet, which were badly broken and mangled. He also sustained other very severe and painful bodily injuries. There was testimony before the jury which tended to show that on one occasion, at least, prior to the accident, the plaintiff had complained to Joseph Treweek, the defendant company's foreman, of the condition of the cross timbers in proximity to the coupling of the line shaft, and of the risk necessarily encountered by the engineers in charge of the engine in being compelled to stoop or crawl under said cross timber whenever, in the discharge of their duty, they found it necessary to go through the tunnel to examine or oil the bearings. There was evidence which tended to show that when such complaint was made to the foreman he was requested to have the rock cut away at one side of the tunnel, so that a person could pass around the end of the cross timber, or to have the coupling covered with a suitable box, to protect persons from being caught by the protruding bolts; that the foreman refused to cut away the rock, but at the same time promised to see the carpenters and have the coupling boxed; that in reliance on such assurance the plaintiff continued to discharge his duties in the usual way for two or three days thereafter, until the accident occurred. In view of the instructions given by the court, and the verdict of the jury subsequently rendered, these latter facts must be accepted as proven. The complaint, which was in the usual form, charged that the defendant company was guilty of culpable negligence in allowing the line shaft to remain uncovered for its full length, and especially at the place where the two sections were coupled together. There was a verdict in favor of the plaintiff, and against the defendant company, for $23,000.

G. C. Moody and A. B. Kittredge (C. H. Winsor, on the brief), for plaintiff in error.

John E. Carland, for defendant in error.

Before CALDWELL and THAYER, Circuit Judges.

THAYER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

At the close of all the evidence the defendant, by its counsel, moved the court to direct the jury to return a verdict in its favor for the following reasons:

"First, that the uncontradicted evidence in the case shows that there was no negligence on the part of the defendant; second, that the uncontradicted evidence in the case shows that the negligence of the plaintiff contributed to his injury; third, that there is no evidence in the case tending to show that Joseph Treweek, whom the plaintiff claims made the promise to plaintiff to box the shaft, had any authority from the defendant to make any such promise, or showing that Treweek was either a general or special vice principal of the defendant for the purpose alleged in the complaint."

The refusal of the court to grant this request presents the principal questions that we have to determine.

With reference to the first of the three propositions embodied in the foregoing instruction, it is sufficient to say that we entertain the

opinion that the proposition in question was clearly untenable, and that the court would have erred, had it undertaken to declare, as a matter of law, that there was no evidence tending to show, or from which a jury could rightfully infer, that the defendant had been guilty of a want of reasonable or ordinary care. It must be borne in mind that the line shaft was located in a narrow and dark tunnel; that it revolved with great rapidity; that the coupling with protruding bolts was very near to one of the cross timbers; that a person required to pass at intervals through the tunnel, and to stoop or crawl under this cross timber, would be inevitably exposed to the risk of having his clothing caught by the coupling, and of being horribly injured,—a risk that could easily have been avoided without expense to the defendant company, and without interfering with the operation of its machinery, by simply covering the coupling. These facts were amply sufficient, we think, to warrant a jury in finding that the defendant company was not without fault, and that in the exercise of ordinary care, in view of the location of the line shaft and coupling, it ought to have boxed the coupling, or to have made a passageway so that its employés could have passed that point in the tunnel without encountering on every occasion the peculiar danger above described. No error was committed, therefore, in submitting the issue of the defendant's negligence to the jury, and in refusing to decide it as a question of law.

The second proposition contained in the instruction,—that the uncontradicted evidence in the case showed that the plaintiff was guilty of contributory negligence,—in our judgment, was likewise untenable, and was properly overruled. The defendant seems to have contended, in the course of the trial—First, that the plaintiff was not required or expected, in the discharge of his duties as engineer, to pass through the tunnel, either to oil or examine the bearings of the line shaft, when the machinery was in motion; second, that a safer way had been provided by the defendant company to reach the particular bearing that the plaintiff was attempting to reach when he was hurt than the one actually taken; and, third, that the plaintiff was guilty of carelessness at the moment he attempted to rise to an upright posture after crawling under the cross timber next to the coupling. Considerable testimony was offered to support the first two of these propositions. On the other hand, considerable evidence was introduced which tended to prove that the defendant did both expect and require its engineers to examine and oil the bearings while the line shaft was in motion; that the actual operations of the machinery could be best observed when it was in motion; that the route taken by the plaintiff on the occasion of the accident to reach and examine the bearings was, as the defendant well knew, the one usually taken by its engineers for that purpose; and that on the occasion of the accident no other mode of reaching the back bearings, which the plaintiff desired to reach, was known to him. None of the alleged facts above mentioned, on which the defendant predicated its charge of contributory negligence, can be said to have been undisputed. On the contrary, the specific facts on which the

charge in question was based were contested, and the evidence was conflicting. Under these circumstances, the circuit court submitted to the jury, by instructions which are not subject to criticism, the several issues, whether it was plaintiff's duty to examine the bearings of the shaft while it was in motion, whether he took the proper route to make such examination, and whether he acted at the moment of the accident with a due degree of care and circumspection. The finding of the jury on each of these issues must have been in favor of the plaintiff, and it goes without saying that such findings are not subject to review by this court.

This brings us to a consideration of the third proposition stated in the foregoing instruction, namely, that there was no evidence that Joseph Treweek, the foreman of the mine, had authority to give the assurance or make the promise that the shaft coupling should be covered or boxed. The circuit court not only refused to give this instruction, but it charged to the contrary thereof, as follows:

"If the jury believe from the evidence that the plaintiff, William Fullerton, after discovering or recognizing the danger of passing the coupling on the shaft in question, complained to the proper officer of the Homestake Mining Company (and the court charges you, as a matter of law, that, under the evidence in this case, Joseph Treweek was such officer) of the dangerous condition of the shaft and coupling by which plaintiff had to pass in oiling and examining the bearings on said shaft, and the jury further finds from the evidence that said Joseph Treweek promised the plaintiff, William Fullerton, that the dangerous character of said shaft and coupling would be remedied, and the jury further find that said William Fullerton continued to perform the services in which he was engaged in reliance on said promise, then the plaintiff, William Fullerton, is entitled to recover damages for any injury inflicted upon him, without his fault, by reason of the dangerous condition of said shaft and coupling, within any period after said promise was made which would not preclude all reasonable expectation that the promise would be kept."

As an exception was taken to the action of the trial court in both of the respects last stated, it will be proper to consider them together. The main proposition stated in the foregoing instruction is not disputed, namely, that a servant may successfully maintain an action for injuries sustained by using defective machinery or appliances after he became aware of the defect therein and the danger incident thereto, provided it appears that he notified the master of the defect prior to the injury, and the latter directed him to continue using such machinery, and at the same time promised to repair it, and provided, further, that the servant exercised due care, and that the defect complained of did not render the machinery so imminently and immediately dangerous that he should have declined to use it at all until it was repaired. It is not denied, as we understand, that this principle has become firmly embedded in the law of negligence by numerous decisions of courts of last resort. Hough v. Railway Co., 100 U. S. 213, 225; Clarke v. Holmes, 7 Hurl. & N. 937, 938; Gowen v. Harley, 12 U. S. App. 574, 586, 6 C. C. A. 190, 56 Fed. 973; Laning v. Railroad Co., 49 N. Y. 521; Stephenson v. Duncan, 73 Wis. 404, 41 N. W. 337; Patterson v. Railroad Co., 76 Pa. St. 389; Greenleaf v. Railroad Co., 33 Iowa, 52; Railway Co. v. Watson, 114 Ind. 20, 27, 14 N. E. 721, and 15 N. E. 824; Greene v. Railway Co., 31 Minn. 248, 17 N. W. 378;

Railroad Co. v. Young, 1 U. S. App. 96, 1 C. C. A. 428, 49 Fed. 723; Rothenberger v. Milling Co. (Minn.) 59 N. W. 531.

The contention is, however, that there was no evidence that the complaint made by the plaintiff relative to the dangerous condition of the coupling was addressed to the right person, and for that reason it is insisted that the promise made by Treweek to cover or box the coupling was of no avail to the plaintiff as an excuse for continuing in the defendant's service, and continuing to pass by the uncovered coupling, after he became aware of the danger incident thereto, and that by so remaining in its service he assumed all the known risks of the employment. We apprehend that if it was fairly within the scope of Treweek's authority, as foreman, to cause a board covering to be placed over the coupling of the line shaft, then a promise made by him to a subordinate servant to cover the coupling, in response to a complaint that it was dangerous, must be given the same effect as a like promise made by the defendant itself. And it must be conceded that a like promise made by the defendant would serve to rebut the presumption that the plaintiff intended to assume the risk which he had pointed out. The question is not whether Treweek was a vice principal in such sense that the defendant company would be liable to its employés for all of his negligent acts, but whether his functions were such that he had the right, in the discharge of his duties and in the exercise of his judgment and discretion, to cause the shaft coupling to be covered. If he had such right, then we think that the plaintiff could properly address his complaint to Treweek, and rely on the latter's promise to remedy the existing defect without preferring his complaint to, or seeking a promise from, any one higher in authority. Now, the undisputed facts which have a bearing on the question last suggested were as follows: The defendant company was a corporation of California, having its chief office in that state. It owned and operated five or six mines in the state of South Dakota, and, among others, the Homestake Mine, where the injuries complained of were sustained. It had an agent in the latter state, by the name of Grier, who had general charge of the defendant company's business in South Dakota, and was termed its "general superintendent." The operations of the defendant company were so extensive that it found it necessary to maintain and operate a machine shop in South Dakota, both for the construction and repair of such mining machinery as was needed and used at its several mines. This shop was in charge of a master mechanic by the name of Spargo, who, in addition to his duties as master mechanic, had general charge, as it seems, of the machinery of the Black Hills & Ft. Pierre Railroad Company. Joseph Treweek was day foreman of the Homestake Mine, and in that capacity had power to hire and discharge men, to direct them where and how to work, and generally to control all the ordinary daily operations at the Homestake Mine. When on duty at the mine he seems to have been the representative of the defendant company, with whom all the employés who were engaged in taking out, handling, and crushing ore came immediately in contact, and from whom they received

their orders. The testimony showed that on one occasion, shortly before the accident, the plaintiff had requested Treweek to remove a projecting piece or point of rock at the entrance of the aforesaid tunnel, which rendered it difficult and dangerous for the engineers to pass by the belting when they had occasion to enter the tunnel to examine the bearings of the line shaft, and that Treweek, as foreman, promised to remove the rock, and immediately thereafter caused it to be removed. In view of these facts, we think it is manifest that Treweek had the right to cause an ordinary board covering to be placed over the coupling of the line shaft, for the purpose of rendering it more safe, without consulting the company or any of its superior officers. It was an act that did not require a previous conference either with the general superintendent or the master mechanic, because it did not involve any alteration of the machinery, or interfere to any extent with its operation. When the defendant company appointed Treweek as its foreman, it no doubt intended that he should exercise his judgment and discretion with respect to the propriety of placing a covering over exposed parts of the machinery, of which complaint was made to him that they endangered the safety of those employés who frequently had occasion to pass in close proximity to the same. Unless he had such authority in his capacity as foreman, he would be powerless to guard the company's interests as it is doubtless expected that they would be guarded. At all events, we entertain no doubt that it was within the apparent scope of Treweek's authority to hear complaints touching such a defect as was pointed out by the plaintiff, and that it was also within the apparent scope of his authority to promise that it should be remedied. It results from these views that no error was committed by the trial court in charging the jury as it did on this branch of the case, and in refusing to charge as the defendant company requested.

It is further contended by counsel for the defendant company that, notwithstanding the promise made by its foreman to cover the exposed coupling, the plaintiff should nevertheless be held to have assumed the risk incident thereto, because the promise in question was not a promise to repair an existing defect in machinery, but rather a promise to supply a new or additional appliance, which the company was under no obligation to furnish, no matter how necessary the same might have been for the protection of its employés. We think that this proposition is wholly untenable. It is doubtless true that a master is not bound to abandon the use of a particular machine or appliance, which is in common use, and in a proper state of repair, merely because there are other machines or appliances in use that are better adapted for doing the work, or that may be handled with greater safety. Marsh v. Chickering. 101 N. Y. 396, 5 N. E. 56; Burke v. Witherbee, 98 N. Y. 562; Railway Co. v. Linney. 19 U. S. App. 315, 7 C. C. A. 656, 59 Fed. 45. In view of the undisputed fact that the kind of coupling appliance which was attached to the line shaft when the accident occurred was then in very general use, the doctrine invoked, and the authorities cited by the defendant in support of its last-men-

tioned contention, would doubtless relieve it from liability for using that kind of coupling appliance, although a safer and better coupling appliance might have been used to connect the line shaft. But the doctrine in question cannot be successfully invoked for the purpose of relieving an employer of the duty of placing a suitable guard around a piece of machinery or an appliance which is of that nature, or so located, that it is a constant menace to the safety of those who, in the discharge of their duties, are frequently compelled to pass in close proximity to it. In such a case the obligation of the master to place a suitable guard around a dangerous piece of machinery is no less imperative than his duty to remedy a defect in the machine itself.

Passing to another branch of the case, complaint is made that the trial court refused to permit the plaintiff, William Fullerton, to answer the last three of the following questions which were propounded to him in the following order on his cross-examination:

"Q. Have you not been told by your counsel that your whole case depended on your swearing that Joseph Treweek made you this promise? A. No, sir. Q. Don't you know the fact that your whole case depended upon it? Q. Don't you know, Mr. Fullerton, that your whole case depends—and did you not know before you brought this suit—upon proving, or convincing the jury, that Joseph Treweek made certain promises about boxing in that coupling? Q. Do you not know now, Mr. Fullerton, and are you not conscious, that your whole case depends upon your stating what Joseph Treweek, the day foreman of the mine, promised you with reference to boxing that coupling shaft?"

These questions were obviously asked for the purpose of impeaching the credibility of the witness. From a critical standpoint, they were objectionable in form, and the objection thereto was doubtless sustained, because they called upon the witness to declare, as a matter of law, upon what ground the right to recover depended. As the questions, taken literally, were founded on the assumption that the controversy over the alleged promise to box the coupling was the sole issue in the case, possibly the jury might have been misled if the questions, in that form, had passed unchallenged. By altering the form of the questions so as to inquire concerning the belief entertained by the witness at the time of bringing his suit and at the time of giving his testimony, the objection interposed would have been obviated. And if the questions had been modified as last suggested, and the trial court had then declined to permit the witness to answer, the exception would have been entitled to more weight. Trial courts should be allowed a liberal discretion in determining the latitude to be given to a cross-examination, and particularly in determining the form in which questions should be propounded to a witness which are simply designed to impeach his credibility. We are not prepared to say, therefore, that the trial court exceeded its discretionary powers in sustaining the objection to the several questions above quoted. Moreover, as the court permitted the witness to answer the first of the above questions, we feel satisfied that its refusal to permit the remaining questions to be answered had no material effect on the ultimate issue of the trial.

Complaint is also made that the court refused to give certain other instructions which were asked by the defendant company. But a careful examination of the charge given by the trial judge satisfies us that

the substance of all the refused instructions was given, in so far as they were proper instructions, and were not calculated to mislead the jury. The jury seem to have been very fully instructed on all the salient features of the case, and it would have served no useful purpose to have given a number of instructions that were asked by the defendant which were perhaps unobjectionable. One instruction asked by the defendant requested the court to declare, in substance, that it was the duty of the plaintiff himself to have boxed the coupling, if he considered it dangerous and if he could have boxed it in connection with the discharge of his other duties, and that by failing to do so he assumed the risk of getting hurt. No error was committed, however, in refusing this request. The work of boxing the coupling pertained to the carpenter department. The foreman, Treweek, recognized that fact when the danger was pointed out to him, by promising to send the carpenters to cover it. The plaintiff, we think, was under no obligation to turn aside from his ordinary duties, and construct a box to cover the coupling, especially after the foreman's attention was called to the alleged defect, and he had promised to send the carpenters to cover it; and he cannot be said to have assumed the risk of injury because he failed to do so. The danger complained of could not be remedied by merely driving a nail or inserting a screw to render a simple tool or appliance more secure, but it involved the selection of materials, and the expenditure of some time, labor, and skill, to wholly obviate the danger.

It is finally insisted by the defendant that the damages assessed by the jury are excessive, and that the verdict ought to be set aside for that reason. The circuit court had an undoubted right to set aside the verdict and order a new trial, and it should have exercised that power if, in view of the amount of the recovery, it was satisfied that the jury had been influenced by prejudice or passion, or that they had made a gross mistake of fact in assessing the damages. It is needless to say, however, that we are not possessed of any such revisory power, inasmuch as the damages assessed are less than the sum alleged and claimed in the complaint. This court is limited to the inquiry whether the jury was properly directed as to the mode of assessing the damages. Railroad Co. v. Fraloff, 100 U. S. 24, 31; New York, L. E. & W. R. Co. v. Winter's Adm'r, 143 U. S. 60, 75, 12 Sup. Ct. 356; Lincoln v. Power, 151 U. S. 436, 14 Sup. Ct. 387. The charge of the court on that branch of the case was as follows, and we are not able to say that it was substantially erroneous:

"If you find for the plaintiff, you will allow him what lawyers call 'compensatory damages'; that is, damages for his loss of limbs, loss of time, and for the pain endured by the accident. You are the sole judges of this amount. There is no rule to govern you in such cases but your own good judgment and sound discretion. A great and wise judge has said, there is no price current for human pain and suffering. You cannot give any exemplary damages. If this plaintiff is entitled to recover, his recovery is limited to compensatory damages. Your verdict should not be influenced by passion or prejudice. The defendant has the same rights that any private individual has."

Finding no error in this part of the charge, nor in the record, considered as a whole, which, in our opinion, would warrant us in disturbing the verdict, the judgment of the circuit court must be affirmed.