## CROOKSTON LUMBER CO. v. BOUTIN.*

(Circuit Court of Appeals, Eighth Circuit. November 30, 1906.)

No. 2,418.

**1. MASTER AND SERVANT—HAZARDOUS BUSINESS—CARE REQUIRED.**

Where a master was engaged in operating a steam sawmill, it owed a duty to its employés to exercise all reasonable care to provide them with suitable and reasonably safe machinery and instrumentalities with which to perform their work.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 173, 203.]

**2. SAME—DEATH OF EMPLOYÉ—NEGLIGENCE—QUESTION FOR JURY.**

In an action for the death of a sawmill employé, by being pushed against the saw by the log carriage, the fact that the carriage mechanism was so out of repair that the carriage would creep along the track toward the saw when the controlling lever was in a position intended to keep the carriage at rest was sufficient to present a question for the jury.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 1010–1050.]

**3. SAME—ASSUMED RISK.**

Where decedent, a sawmill employé, gave notice to defendant of a defect in the log carriage, and secured a promise from the superintendent of the mill to repair the same, decedent did not assume the risk of injury caused by the defect in the carriage in continuing to work for a time thereafter reasonably sufficient to enable defendant to repair the carriage, unless the risk was so obviously and imminently dangerous that a person of ordinary prudence would not have taken it.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 574, 583, 587, 641, 644.

Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

**4. SAME—CONTRIBUTORY NEGLIGENCE—PROMISE OF REPAIR.**

That decedent, a sawmill employé, gave notice to defendant of the defective condition of a log carriage, and secured a promise to repair, did not relieve him from the necessity of exercising reasonable care for his own safety in performing his duties, nor deprive the defendant of the defense of contributory negligence in case decedent failed to do so and was injured.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 675, 676, 706–709, 724, 727, 729.]

**5. TRIAL—QUESTIONS OF LAW OR FACT—DISPOSITION.**

A question of law always arises at the close of the evidence in any case in the federal courts, whether there is any substantial proof warranting a verdict in favor of plaintiff; and, in determining such question, all the evidence and reasonable inferences therefrom must be considered in the light most favorable to plaintiff.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trial, §§ 339, 402.]

**6. SAME.**

In order to justify the direction of a verdict, in an action tried in the federal courts, the undisputed evidence must be so conclusive that all reasonable men, in the exercise of an honest and impartial judgment, can draw but one conclusion therefrom, and that the court, in the exercise of a sound judgment, would be required to set aside a verdict returned in opposition thereto.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trial, §§ 338, 340, 379, 383.]

* Rehearing denied February 12, 1907.

**7. Master and Servant—Death of Servant—Contributory Negligence.**

Decedent, an employé in a sawmill, before operations had commenced in the morning, took a position on the sawyer's side of the pulleys over which the band saw was operated, practically in front of the saw, and within two feet of it while it was being run at a high rate of speed. Decedent placed his left foot on the rail of the carriage track, and his right foot was raised and resting on a lower extension of the guard plank, his back being toward the log carriage. In this position plaintiff endeavored to clean sawdust from the upper pulley with a stick, and while doing so, the log carriage, the mechanism of which was defective, noiselessly crept up from behind him unobserved, and before he could escape, forced his body against the teeth of the saw, by which he was instantly killed. Decedent had knowledge of, and had complained of the creeping motion of the carriage, and had received a promise of repair two or three days before the accident; but, while standing in the position he occupied, he took no precautions to ascertain whether the carriage was still. The position that decedent took to clean the pulley was peculiar to him, and he could easily have occupied a different position where he would have been perfectly safe from the danger. *Held*, that decedent was guilty of contributory negligence, as a matter of law.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, § 729.]

**8. Same—Repair of Defects.**

Where the repair of a log carriage mechanism in a sawmill would probably have involved a reconstruction of the valves leading into the carriage cylinder, and have required a general overhauling of the mill under and on which the connections between the boiler and the carriage were located, and an employé complained of a defect in the carriage, and obtained a promise of repair, it was the height of recklessness for him to presume, in the absence of any evidence that such repairs were in progress, that they had been made two or three days after the promise was given.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 643, 645, 675, 706, 729.]

In Error to the Circuit Court of the United States for the District of Minnesota.

Marie F. Boutin, as administratrix of the estate of Frank Boutin, deceased, brought this action against the lumber company to recover damages for the death of the decedent who was her husband. The lumber company was operating a steam sawmill at Crookston, Minn. Logs were hauled from the river and rolled upon a deck at the north end of the mill from which, as needed, they were separately rolled upon a carriage which carried them up against a vertically running band saw to be worked into lumber. This carriage was about 60 feet long, constructed of wood and iron, and sufficiently heavy, bulky, and strong to steadily support and carry a large log. It was connected with a piston rod driven by steam conducted from the boiler to the cylinder through adjustable valves connected by rods and cranks with the operating lever located on the west side of the track on which the carriage ran. The head sawyer, by operating the lever, could so open and close the valves as to run the carriage back and forth past the saw as business required. When the carriage was not in operation, the lever stood upright or perpendicular. A forward push of the lever started the carriage forward from the log deck, and a backward pull stopped the progress of the carriage and returned it to the starting point for another similar movement. The day crew began work at 7 o'clock in the morning, but at 5 minutes before 7, the mill was started up to secure the proper speed of the saw, before work began. The saw was a continuous band of steel with teeth on one edge only, so operating around two large pulleys revolved by steam power, and so located at the west side of the track as to present its toothed edge

to the end of the carriage as it brought a log up against it for sawing. This preliminary start put the pulleys and saw only into motion. It was not intended to, and did not, cause the forward and backward movement of the carriage. The crew consisted among others of the head sawyer, who, among other duties handled the lever for operating the carriage, and whose place was in front of the pulleys about three feet west of the carriage track, and a tail sawyer, who, among other duties, took off the sawed product from the carriage after the log had passed the saw, and whose place was behind the pulleys, a safe distance west of the track. The flying sawdust produced by the operation of the mill collected on the inside of the rim of the upper pulley, and, in order to keep the machinery in proper adjustment, required frequent removal. The rim was about 12 inches wide, and was supported by spokes leading from the hub to it, leaving a few inches on either side of the spokes so exposed as to be readily cleaned by holding a stick fast against it and permitting the revolving wheel to pass it. This operation of cleaning off the sawdust was generally performed while the mill was speeding up preparatory for beginning work. The head sawyer's business was to clean the side of the rim next to him, and the tail sawyer's business the side next to him. The place where the head sawyer stood to operate his lever was so near to the rim of the pulley that he could reach it with the usual stick employed for the purpose of cleaning it. There was a guard consisting of an upright plank between his standing place, and the revolving pulley over which he could safely perform the cleaning process. There were other places on either side, and close to the upright plank, where one might stand with comparative safety and perform the operation.

There is evidence tending to show that, by reason of improper adjustment of valves intended for admitting steam into the cylinder, it had for some time before October 8, 1904, forced its way slightly into the cylinder and against the piston so as to move it and the rod connecting with the carriage, thereby giving the carriage what is called a "creeping, advancing motion," even when not desired or expected, and when the lever was locked in an upright position. Although denied by defendant's witnesses, there is evidence tending to show that such creeping motion had frequently occurred just before October 8th, during the time the mill was being speeded up before the hour of starting came. The decedent had been working for the lumber company for several months in the capacity of tail sawyer. He had frequently noticed this apparently automatic creeping motion of the carriage, had warned other workmen of it and had cautioned them to exercise care. A short time before October 8th he told witness Munn to watch the carriage, that he could not tell when it might start. Two or three days before that day he complained to defendant's superintendent about it and secured a promise that it should be repaired and put in order. On that day decedent went to his work as usual. After the speeding of the mill had begun and about 2 or 3 minutes before 7 o'clock he went to his place, back or south of the pulleys, took the stick, and cleaned the inside rim next to him. The evidence shows that the duties of his employment usually kept him on the south side of the pulleys, and did not require him to go to the north side except when a newly filed saw was to be substituted for a dull one, on which occasion only he was required by the terms of his employment to be on the north side to help the head sawyer make the change. But there is evidence tending to show that decedent frequently went over to the head sawyer's side and performed for him the service of cleaning the rim on that side.

On the morning in question, October 8, 1904, after cleaning the rim on his side, the head sawyer, not having gone to his lever, but standing some distance across the carriage track eastwardly thereof examining directions for the work of the day there posted, the decedent went over to the north side apparently to help the head sawyer. Instead of taking the position of absolute safety behind the upright guard plank, or either of the other positions of comparative safety a sufficient distance away from the carriage track, he took a position practically in front of the saw, within two feet of it, while it was running at the rate of 5,000 feet per minute, with his left foot on the west rail of the carriage track, and his right foot raised and resting upon

a lower extension of the guard plank; and there with his back to the carriage that might at any time, as he knew, noiselessly start and bear down upon him, he stood holding the stick against the rim of the pulley in the process of cleaning it. While so doing, and without any backward look by him, the carriage did start, and, without observation by him, moved down upon him, forced his body against the teeth of the saw, and he was instantly killed.

At the close of all the evidence defendant's counsel moved for an instructed verdict in its favor. The motion was denied and exception duly allowed. A verdict and judgment followed in favor of the plaintiff, and this writ of error was prosecuted to secure a reversal of that judgment.

Thomas J. Davis (Theodore Hollister, on the brief), for plaintiff in error.

Charles Loring (Halvor Steenerson, on the brief), for defendant in error.

Before VAN DEVANTER and ADAMS, Circuit Judges, and PHILIPS, District Judge.

ADAMS, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The defendant was engaged in a hazardous business. It owed a duty to its employés to exercise all reasonable care to provide them with suitable and reasonably safe machinery and instrumentalities with which to do their work.

The evidence, we think, was sufficient to go to the jury on the issue of negligence as charged. It tended to show that defendant did not exercise reasonable care in keeping the log carriage well in hand or sufficiently under control during the preliminary period of speeding up its mill, to prevent its insidious and dangerous movement along the track where employés were likely to be. There was also substantial evidence tending to show that the decedent complained to the superintendent of defendant company about the dangerous condition of the machinery, and particularly about the sudden and uncontrolled movement of the log carriage, and secured a promise from him to repair the same. The last mentioned facts, unless the risk of remaining was so obviously and imminently dangerous that a person of ordinary prudence would not have taken it while the promised repairs were being made, warranted the decedent in continuing to work for the defendant for a time thereafter reasonably sufficient to enable it to make good the promise, without assuming the risks ordinarily incident to the use of known defective machinery (Hough v. Texas Pacific R. Co., 100 U. S. 213, 225, 25 L. Ed. 612; District of Columbia v. McElligott, 117 U. S. 621, 6 Sup. Ct. 884, 29 L. Ed. 946; Northern Pacific Railroad Co. v. Babcock, 154 U. S. 190, 200, 14 Sup. Ct. 978, 38 L. Ed. 958; Cudahy Packing Co. v. Skoumal, 60 C. C. A. 306, 125 Fed. 470, 473; Homestake Min. Co. v. Fullerton, 16 C. C. A. 545, 69 Fed. 923; Roccia v. Black Diamond Coal Min. Co., 57 C. C. A. 567, 121 Fed. 451); but they did not relieve him from the obligation to exercise reasonable care and precaution for his own safety while so continuing to perform the work.

Defenses predicated upon assumption of risk and contributory negligence are essentially different. Choctaw & Oklahoma, etc., R. R.

Co. v. McDade, 191 U. S. 64, 68, 24 Sup. Ct. 24, 48 L. Ed. 96; St. Louis Cordage Co. v. Miller, 61 C. C. A. 477, 126 Fed. 495, 501, 63 L. R. A. 551; Narramore v. Cleveland C. C. & St. L. Ry. Co., 37 C. C. A. 499, 96 Fed. 298, 304, 48 L. R. A. 68; Cleveland C. C. & St. L. Ry. Co. v. Baker, 33 C. C. A. 468, 91 Fed. 224; Peirce v. Clavin, 27 C. C. A. 227, 82 Fed. 550, 553; Miner v. Connecticut River Railroad, 153 Mass. 398, 403, 26 N. E. 994. Therefore, notwithstanding the fact that decedent, by giving notice to defendant of the defective condition of its machinery and securing a promise of its reparation, might have escaped for some time the personal assumption of the risk ordinarily attendant upon continued service with such defective machinery, he might, and as will be presently seen, did not thereby relieve himself from the necessity of exercising reasonable care for his own safety in performing the service, or deprive the defendant of the defense of contributory negligence if he failed to do so.

In District of Columbia v. McElligott, supra, the Supreme Court, in commenting upon the care required of a person situated like the decedent, said:

"If he exposed himself to dangers that were so threatening or obvious as likely to cause injury at any moment, he would, notwithstanding any promises or assurances of the district supervisor of the character alleged, be guilty of such contributory negligence as would defeat his claim for injuries so received."

In St. Louis Cordage Co. v. Miller, supra, this court, after announcing the general doctrine of assumption of risk in ordinary cases, and calling attention to the exception relieving an employé from its obligation after making complaint and securing a promise of reparation said:

"Of course cases which fall under the exception are not governed by the rule, but the only defense remaining in such cases is that of contributory negligence."

And in Homestake Min. Co. v. Fullerton, supra, this court said the rule which permits an employé to recover in cases coming within the exception is subject to the proviso:

"That the servant exercised due care and that the defect complained of did not render the machinery so imminently and immediately dangerous that he should have declined to use it at all until it was repaired."

See, also, 1 Labatt on Master & Servant, § 432.

In the light of the foregoing exposition of the law, we cannot agree with plaintiff's counsel that the complaint of defective machinery and the promise by defendant to repair it rendered it liable in this action— notwithstanding any negligence of the decedent. Such is not the law. He might have been relieved from the assumption of ordinary risks attendant upon the use of defective machinery, but he still remained under the obligation of exercising reasonable care for his own safety. The rule defining reasonable care in any given case to be that care which ordinarily prudent persons commonly exercise *in like circumstances* is probably a sufficient generalization, provided emphasis is placed upon the last italicized words. The circumstances surrounding a person at the time of his injury naturally, as well as a matter

of law, furnish an important consideration in ·determining whether due care is observed by him. When he has such knowledge of danger incident to the use of machinery as prompts him to complain to his master about it, and to require its repair as a condition for remaining longer in his service, such circumstances indicating imminent personal peril would most naturally suggest to an ordinarily prudent person the necessity for unusual care and watchfulness for his own safety. The triers of the fact should therefore take into consideration this naturally prudent instinct in determining whether on a given occasion one has exercised ordinary care as just defined. Labatt on Master & Servant, supra. It is a well-settled rule, recognized by the courts of the United States, that a question of law always arises at the close of the evidence in any case, whether there is any substantial proof warranting a verdict in favor of the plaintiff. In applying this rule, consideration most favorable to plaintiff must be given to all the evidence and reasonable inferences arising therefrom (Mt. Adams, etc., Ry. Co. v. Lowery, 20 C. C. A. 596, 74 Fed. 463) ; the undisputed evidence must be so conclusive (1) that all reasonable men in the exercise of an honest and impartial judgment can draw but one conclusion from it (Chicago, etc., Ry. Co. v. Price, 38 C. C. A. 239, 97 Fed. 423) ; and (2) that the court would in the exercise of sound judgment set aside a verdict returned in opposition to it (Railroad Co. v. Jones, 95 U. S. 439, 24 L. Ed. 506; Delaware, etc., Railroad v. Converse, 139 U. S. 469, 11 Sup. Ct. 569, 35 L. Ed. 213 ; Elliott v. Chicago, Mil., etc., Railway, 150 U. S. 245, 14 Sup. Ct. 85, 37 L. Ed. 1068). The rule just announced is equally applicable when the issue of contributory negligence is involved. Elliott v. Chicago, Mil., etc., Railway, supra; Pyle v. Clark, 25 C. C. A. 190, 79 Fed. 744; Missouri Pacific Railway Co. v. Moseley, 6 C. C. A. 641, 57 Fed. 921 ; Claus v. Northern Steamship Co., 32 C. C. A. 282, 89 Fed. 646; Rich v. Chicago, Mil., etc., Railway (just decided by this court) 149 Fed. 79.

Tested by the rule just announced in any or all its phases, we entertain no doubt about the contributory negligence of the decedent in this case. Conceding to him the full right of going to the head sawyer's side of the pulleys, and conceding that it was his duty to clear that side of the rim of the upper pulley as well as his own, both of which are disputed by defendant, his method of doing the work according to the undisputed evidence was peculiar to himself. There is no substantial proof that any one else ever undertook to clean that side of the rim when standing as and where the decedent did. There is satisfactory proof that no head sawyer whose employment expressly comprehended that duty ever undertook to do it that way. Only one witness out of many who were examined testified that he had ever seen decedent do it in that way, and this witness said that it could have been done some other way, but that it appeared to be the easier way to do it by standing in the place where decedent stood. It must be borne in mind that the cleaning could not have been done when the saw was not in motion. The pulley necessarily had to revolve in order to clean the rim, and with its revolution the saw was also necessarily in motion, so that any proximity to the saw while cleaning the rim was potentially dangerous.

The decedent was in the prime of early manhood, and possessed of unimpaired faculties of mind and body so far as the record discloses. He knew of the creeping tendency of the carriage, and was aware of its lurking danger and horrible consequence. He had only a few days before warned a fellow laborer of its liability to suddenly start and move upon the tracks toward the saw, and cautioned him to be careful. Only two or three days before, he had given notice to his employer that he could not continue in its service, if it did not put a stop to that dangerous action. With all this knowledge, at a time when the mill was speeding up and when alone the creeping motion could occur, and when, as known by him, it was liable to occur, he took his place on the track over which the carriage would necessarily move, in front of and close to the rapidly moving saw, and occupied himself intently with cleaning the rim of the pulley. He was in a place of imminent danger, in such circumstances, and with such knowledge of his peril as, under the rule requiring him to exercise the care which ordinarily prudent persons do under like circumstances, imperatively demanded immediate, constant, and anxious vigilance and watchfulness on his part. He exercised no vigilance at all. He could have detected the approach of the carriage by looking, but he did not. He paid no heed to the momentary possibility well known to him of the carriage moving down upon him, but stood there, back towards its approach, until about the moment it struck him, when, by its touch and a warning shout of one of his co-employés, he was aroused from his danger too late to save himself from the inevitable consequence. Tested by any expression of the rule governing the subject, found in text-books or adjudicated cases, the conduct of the decedent, as disclosed by uncontradicted and indisputable, proof, was so heedless of consequences, so hazardous and reckless as to clearly constitute contributory negligence on his part, and to warrant and require the court to say so as a matter of law.

Counsel for plaintiff ask us to say that, because of the promise to repair made two or three days before his death, the decedent had a right to assume that the machinery had, during those two or three days, been so repaired as to prevent the creeping motion of the carriage. Such repairs probably would have involved a reconstruction of the valves leading into the cylinder, and possibly of the pipes leading from the boiler to the cylinder, and of the rod leading from the piston to the carriage, and any of these repairs probably wou'd have required a general overhauling of the mill under and upon which the connections between the boiler and the carriage were located. It is inconceivable that this work could have been done without attracting general attention; but whether the repairs might have been made in two or three days or not is wide of the mark. Considering the imminent peril and danger of doing what the decedent did unless the repairs had been made, it was the height of recklessness to blindly assume without inquiry, and in face of the improbability of their being done without his knowledge, that they had been made, within the short period of time mentioned, and on such mere assumption to have incurred the great risk which he did.

'Again counsel contend that the decedent, being a short man, could not conveniently reach over the upright guard plank from which the head sawer always cleaned his side of the rim of the pulley. That may be so, but whether convenient or not he could have done it, and he could also have performed the act of cleaning while standing at the side of the plank, somewhat nearer to the revolving pulley. There was no special urgency on the morning when the casualty in question happened which required any impetuous, hasty, or unusually prompt action by the decedent. He had ample time to do the work before 7 o'clock. A place from which he could have performed his task in perfect safety was provided by defendant, and he was not justified from any considerations of personal convenience or otherwise in ignoring that provision and adopting the terribly dangerous method which he did. Morris v. Duluth, etc., Ry. Co., 47 C. C. A. 661; 108 Fed. 747; Gilbert v. Burlington, etc., Ry. Co., 63 C. C. A. 27, 128 Fed. 529.

After a careful consideration of all the evidence, and of all the propositions of law contended for by learned counsel for the plaintiff, we are constrained to say that contributory negligence was so apparent from all the evidence that the Circuit Court erred in not instructing the jury to find for the defendant. The judgment must be reversed, and the cause remanded, with instructions to grant a new trial; and it is so ordered.