[No. 12216.  *En Banc.*  November 19, 1915.]

Louis Olson, *Respondent*, v. Seldovia Salmon Company, *Appellant*.[1]

Master and Servant — Injuries to Servant — Assumption of Risks—Safe Place—Assurance of Safety.  A laborer in a fish cannery does not, as a matter of law, assume the risk of danger from a projecting key upon a revolving shaft, near the extreme end of the shaft where no person would have reason to expect it, and where he was ordered by the foreman to work in a narrow space in close proximity to the shaft; that being itself an assurance as to the safety of the place.

Master and Servant — Dangerous Appliances — Knowledge of Master—Evidence—Hearsay—Admissibility.  For the purpose of showing knowledge of the employer of a projecting set screw on a revolving shaft, it is admissible to show a previous conversation with the general manager calling attention to it as dangerous; especially where it was not objected to as hearsay, and no request was made for an instruction limiting its effect to the subject of notice.

New Trial—Newly Discovered Evidence—Discretion—Conflict. It is not an abuse of discretion to refuse a new trial for newly discovered evidence which was not very material and largely cumulative, where the same was contradicted by an equal number of witnesses equally credible.

Appeal from a judgment of the superior court for King county, Gilliam, J., entered January 23, 1914, upon the verdict of a jury rendered in favor of the plaintiff, in an action

[1]Reported in 152 Pac. 1033.

for personal injuries sustained by an employee in a cannery. Affirmed.

*Vanderveer & Cummings,* for appellant.

*Arctander & Jacobsen,* for respondent.

PARKER, J.—The plaintiff commenced this action in the superior court for King county, seeking recovery of damages which he claims resulted to him from the negligence of the defendant in maintaining dangerously defective machinery near which he was directed by the defendant's foreman to work while in the employ of the defendant. Trial before the court and a jury resulted in verdict and judgment in favor of the plaintiff in the sum of $2,500, from which the defendant has appealed.

The question here presented which we regard as of most importance arises upon the claim made by counsel for appellant that the trial court erred in denying their challenge to the sufficiency of the evidence to warrant the submission of the cause to the jury, made at the close of the evidence introduced on respondent's behalf. No further challenge was made to the sufficiency of the evidence with the view of having the cause determined in appellant's favor as a matter of law. We therefore summarize the facts as they appear from the exhibits and the testimony of the respondent and his witnesses at the conclusion of the evidence introduced in his behalf. Manifestly, whatever evidence was thereafter introduced by appellant tending to contradict the testimony of respondent and his witnesses is foreign to the question of the correctness of this ruling of the trial court.

Appellant is a corporation existing under the laws of this state, with its principal place of business at Seattle. It is engaged in the salmon fishing and canning business, maintaining a plant at Seldovia, Alaska. It was at this plant that respondent was injured by having his clothing caught on a projecting key upon a revolving shaft while performing his work in obedience to the directions of appellant's fore-

man.  Appellant's cannery building at Seldovia rests upon piling over the water, the floor of the building being on a level with the adjoining wharf.  Near the southwest corner of the building, there is an elevating carrier to convey fish from vessels or scows up into the building.  This carrier passes through the wharf just outside the west wall of the building and into the building through its west wall, projecting into the building a distance of four or five feet.  It is about four feet north of, and parallel with, the south wall of the building.  It consists of endless chains with cross-pieces of wood attached thereto running up over the floor of the carrier.  The fish are carried up by these cross-pieces and dropped over the upper end of the carrier into a chute.  The exact pitch and height of the carrier above the floor does not clearly appear, but in any event its position is such that a man can stand by it on its south side and reach the fish as they are ascending.  It becomes necessary for a man to relieve the clogged condition of the carrier which occasionally occurs, and when doing this, one is required to go to the carrier on the south side, that is, between the south side of the carrier and the south wall of the building, which, as we have noticed, are about four feet apart.  A shaft which communicates power to the carrier runs parallel with the west wall of the building, about four feet therefrom and about three feet above the floor.  It runs through bearings attached to six by six inch posts on each side of the carrier, which support the carrier.  This shaft projects about eighteen inches beyond the south post and a pulley which is very close to the south post, without any protection whatever, to within about twenty inches of the south wall of the building.  So there is a space about four feet square practically enclosed by this shaft, the carrier and the west and south walls of the building, in which space a man is required to go occasionally to attend to the carrier.  One going in there for this purpose is required to pass between the end of the projecting shaft and the south wall of the building.  The pulley, close to the

south post on the projecting shaft, is secured to the shaft by a key. This key projects from the pulley along the shaft in a channel to within two inches of the end of the shaft. On the extreme outer end of the key is a shoulder projecting out at right angles to the shaft a distance of about one inch. The speed of the shaft when revolving is comparatively slow; however, it is such that the key and its projecting shoulder are not readily noticeable when the shaft is revolving. The key is noticeable only by very close inspection when the shaft is revolving, the shaft then having the general appearance of being smooth and free from projections.

For about three weeks prior to the day respondent was injured, he was employed by appellant as night watchman at the plant. He had no other duties about this particular building, though it was his duty, in addition to that of watchman, to keep up the fires in the boiler during the night. As to additional duty imposed upon him and instructions given him relative thereto by the foreman on the evening of the day before he was injured, respondent testified as follows:

"Q. Now was there any change made; was any additional work put onto you after you had started as night watchman and up to the time you were hurt? A. Well the night previous to the night I was hurt— Q. On the 15th of June in the evening you were hurt? A. Yes, sir. Q. Now the evening before that, what happened then? A. Mr. Whorf (the foreman) told me as I was standing—I can't quite remember if I was cleaning out the boiler or throwing in coal, he told me absolutely to go over there when they were taking up fish to look after the fish. Q. Do what? A. Look after the fish; see that the fish was not going into the gear and breaking it, or some of it going back into the water. Q. He told you to do that that night? A. Yes, sir. Q. That was the night before you were hurt? A. Yes, sir. Q. Now, at that time had the fish come up? A. They were through with the fish—taking up fish, when he came in through the cannery. Q. When he told you this? A. Yes, I was in the boiler room. Q. Prior to that time when you were there as watchman has the fish come in after your work begun? A. No. Q. That was the first night that they had come in?

A. Yes, sir.   Q. While you were there?   A. Yes, sir.   Q. Prior to the time when fish came up the night that you were hurt, had you been over in that corner of the cannery at all? A. No, I had nothing there to do.   Q. Had you had any opportunity to look at the machines there before that?   A. No, sir."

As to what he did and what happened when he was hurt the next evening, he testified as follows:

"Q. What time about was it when the fish commenced to run—commenced to be taken in?   A. Well, I don't know, around five o'clock I guess.   Q. When did you get around there?   A. Well, I was there a little after five.   Q. At a little after five; you went over there; did you see anything about the fish falling down?   A. Well, yes, I did.   Q. How long had they been working lifting up the fish before you saw them falling down?   A. Oh, I couldn't say quite.   It might have been a half an hour or three quarters of an hour.   Q. As soon as you saw the fish falling down what did you do?   A. Well, I went in between the revolving shaft and the wall to get in there to pick the fish out from the gear.   .   .   .   Q. Well, you can come down here and stand on the side there and show the jury just how you came in; now, you came in what way?   A. Well, I came in this way down in here (indicating); opposite the wheel and opposite the shaft there, and was in here and picked out the fish (indicating); as I couldn't stay away from the boiler very long, I didn't see no more fish in here and I went out as carefully as I could by the shaft here, going back to the boiler. Q. You went out back to the boiler?   A. That is when my coat caught.   Q. Now, at that time when you went in between the shaft—did you notice how much of a space there was?   A. Well, I know that I took my clothes—coat together like this (indicating) and went in quite carefully, so I knew it was a pretty narrow space in between.   .   .   . Q. After you had taken the fish out there that was there, you went back again the same way?   A. Yes, sir, I did. Q. When you went back between the shaft and the wall, just state how you walked when you walked?   A. Well, I walked the same way as I did when I came in, about the same way, but some way or another the corner of the coat caught on the revolving shaft and the elbow of the key.   I tried to pull

the coat off but the coat was too strong and I couldn't tear it. Before I know it almost I was took around the shaft several times. Of course I hollered and I attracted Mr. Starklauf's attention. He was outside. I can't recollect. I was quite dazed."

While other testimony of respondent shows that he appreciated that there was danger attending the revolving shaft to one coming in contact therewith, it is plain that he did not then know of the existence of the key on the shaft nor appreciate the greater danger attending the presence of the key there. We deem it unnecessary to notice respondent's testimony in detail in this respect.

It is contended by counsel for appellant that respondent should be held to have assumed the risk of being injured by the revolving shaft and the key thereon, as a matter of law, in view of his knowledge and his appreciation of the dangers attending a revolving shaft as disclosed by the evidence introduced in his behalf. We think the weakness of this contention lies in the fact that the respondent did not know of the existence of the key with its shoulder upon the projecting shaft very near its extreme end. While a revolving shaft is of itself, even though smooth, attended with danger, and respondent appreciated such danger, it is manifest that the key with its projecting shoulder made the danger here involved very much greater than as if the shaft had been smooth with no projection upon it. This greater danger respondent did not know of and, of course, therefore he did not appreciate it. Besides, a projection of this nature on the shaft near its extreme end some fifteen inches from the pulley is, we think, a thing no ordinary person would have cause to suspect the existence of, unless particularly called to his attention. The projecting shoulder of the key was not at a point upon the shaft where one would have any reason to suspect the existence of such projection. Had respondent known of the presence of the key and its projecting shoulder upon the shaft very near where he was required

to pass in obeying his master's directions, he would, in all probability, have been induced thereby to exercise a greater degree of care than he did exercise. While the knowledge of the situation as possessed by him did cause him to appreciate the presence of danger, his knowledge was not such as to cause him to appreciate this greater danger and to act accordingly.

In *Pruke v. South Park Foundry & Machine Co.*, 68 Minn. 305, 21 N. W. 276, there was involved a situation somewhat like this. The injured plaintiff in that case was attempting to replace a belt upon a pulley, there being a set screw in the collar of the pulley fastening it to the shaft, the existence of which set screw was unknown to the plaintiff. In holding that the question of plaintiff's contributory negligence or assumption of risk could not be determined as a matter of law, but was a question for the jury, the court observed:

"Plaintiff had worked for defendant about one year, had frequently used the grindstone, and admitted, when testifying, that he had climbed upon the table and box and had replaced the belt more than 50 times before the day of the accident. He further testified that he never saw the screw, and did not know it was there until he was injured. The jury had a right to believe his statement, especially in view of the fact that several of the witnesses, other employees in defendant's shop, had never discovered it, although they had been employed about the shop as machinists for a greater length of time than had the plaintiff. It is true that he should have been ordinarily observant while working in connection with machinery always more or less dangerous, but when we find that one of the witnesses, who had worked in this shop several years, testified that the screw could not be easily seen from the floor, and that one would have to look in order to discover it, we cannot say, as a matter of law, that plaintiff should have noticed it, and must be held to the consequences if he did not. If he had no actual knowledge of the danger that threatened him, and if in the exercise of ordinary care under the circumstances he would not have apprehended the danger in time to have avoided it, he is not

to be charged with contributory negligence. This question was also for the jury."

This view finds support in the following decisions: *Hawkins v. Johnson*, 105 Ind. 29, 4 N. E. 172, 55 Am. Rep. 169; *Chopin v. Combined Locks Paper Co.*, 134 Wis. 35, 114 N. W. 95; *Homestake Min. Co. v. Fullerton*, 69 Fed. 923; *Michigan Headlining & Hoop Co. v. Wheeler*, 141 Fed. 61. The decisions in these cases turn for the most part upon the lack of knowledge on the part of the injured plaintiffs as to all of the elements of danger attending the particular revolving shafts, though in each case the plaintiff had knowledge of the existence of the revolving shaft and an appreciation of some of its attending dangers.

The following cases deal with injuries to young and inexperienced people from revolving shafts, holding the injured plaintiffs did not assume the risk as a matter of law, upon the theory that the court could not say, as a matter of law, that they knew and appreciated all the elements attending danger: *Dowling v. Allen & Co.*, 74 Mo. 13, 41 Am. Rep. 298; *American Tobacco Co. v. Strickling*, 88 Md. 500, 41 Atl. 1083, 69 L. R. A. 909; *Paducah Box & Basket Co. v. Parker*, 143 Ky. 607, 136 S. W. 1012, 43 L. R. A. (N. S.) 179.

It seems to us that even these decisions are, by analogy, applicable here, in that the want of appreciation of all the elements of danger by a young or inexperienced person is analogous to the want of appreciation of all of the elements of danger by respondent attending this projecting shaft with the key thereon, because of his lack of knowledge of the existence of the key and its projecting shoulder which very materially enhanced the danger, which enhanced danger he did not know of and therefore, of course, did not appreciate. Had he known of this element of increased danger he might have exercised a much higher degree of care on coming near the shaft.

Counsel for appellant direct our attention to *Hoffman v. American Foundry Company*, 18 Wash. 287, 51 Pac. 385, and *Brown v. Tabor Mill Co.*, 22 Wash. 317, 60 Pac. 1126. In the *Hoffman* case, the court said: "The collar and set screw were in plain sight when the machinery was not in action, and it is well nigh inconceivable that respondent could have worked around the machinery for four months without knowing its actual condition." Upon this theory, evidently, the court held, as a matter of law, that the injured plaintiff was guilty of contributory negligence in doing what he did so close to the set screw. In the *Brown* case, the shaft which caused the injury was smooth and without any projection thereon. The injured plaintiff, as well as other employees, had for several months repeatedly passed under the shaft, it being necessary to do so in a stooping position. The plaintiff knew of its exact condition. It had no set screw, key or other projection constituting a latent enhanced danger as the key in this case did. We think both of these cases are distinguishable in this respect from the one before us. Another fact that comes to the aid of respondent is that he was directed by appellant's foreman to perform this particular duty, which required him to pass close to the projecting shaft and even to work very close to it when attending the carrier. This direction of itself was an assurance on the part of the employer that it was a reasonably safe place to work. It was not so manifestly dangerous as to charge respondent with assumption of this risk as a matter of law. *Christiansen v. McLellan*, 74 Wash. 318, 133 Pac. 434.

There are decisions of the courts which may seem not wholly in harmony with our views here expressed. We think, however, that, for the most part, they will be found, upon critical examination, to lack consideration of the element of want of full knowledge of all of the elements of danger, such as would cause the injured person to appreciate the full extent of the attendant dangers. We conclude that the trial court could not have properly held, as a matter of law, that

respondent assumed the risk, and that its ruling, made in respondent's favor at the close of the evidence introduced in his behalf, was not erroneous.

Counsel for appellant contend that the trial court erred in admitting, over their objection, certain testimony showing actual knowledge on the part of appellant's superintendent of the existence of the projecting shaft and the key thereon. With a view of so showing, and with the statement on the part of respondent's counsel that it was "simply to show knowledge," a witness for respondent was asked and answered as follows:

"Q. Were you ever at this particular place where this set screw was and this elbow of the key. A. Yes, I remember one occasion where three of us were together there. Q. Now that was before Louie was hurt? A. Yes, sir. Q. How long before? A. It must have been about three weeks. Q. Now what did you, at that time hear Mr. Southworth say to Mr. Whorf, the general manager? Q. What did he say with reference to the set screw? A. He passed the remark that it is rather dangerous to have it uncovered. Q. To have what? A. To have that one running uncovered—without any covering on it. Q. And called his attention to these particular two things which you mention here? A. To the key and the set screw."

It is now argued that the admission of this evidence, over the objection of counsel for appellant, was hearsay, and was erroneous and prejudicial as such. In view of the fact that it was introduced, not for the purpose of showing that the projecting shaft and key were as claimed by respondent and were dangerous, but for the purpose of showing that appellant's superintendent had knowledge of the condition of the shaft and key, we think the evidence was not hearsay. In *Smith v. Whittier*, 95 Cal. 279, 30 Pac. 529, disposing of a similar contention, Justice Harrison, speaking for the court, observed:

"If the fact sought to be established is, that certain words were spoken, without reference to the truth or falsity of the

words, as, for instance, that a certain statement was made by a party to the action as an admission of a fact, or was made to him as a notice, or under such circumstances as to require action or reply from him, the testimony of any person who heard the statement is original evidence, and not hearsay. (Wharton on Evidence, § 254; Greenleaf on Evidence, § 100; *People v. McCrea*, 32 Cal. 98; *People v. Estrado*, 49 Cal. 171). Such evidence is admitted for the purpose of establishing merely the utterance of the words, and not their truth, but the admission in evidence of the words spoken is not to be used in determining the issue of their truth. Necessarily, the words so spoken are brought before the jury, but the jury can readily be instructed by the court that they are not to regard them as proof of the facts that are stated."

See, also, 1 Wigmore, Evidence, §§ 245-252.

If counsel for appellant desired to have this testimony confined more definitely to the question of the superintendent's knowledge of the condition there existing, and avoid having the possible effect of it being hearsay evidence upon the question of the existence of such condition, they had opportunity to request the court to instruct the jury accordingly. There is nothing in this record to indicate that any such request was made, nor even that the court did not so instruct the jury, the instructions of the court to the jury not being before us in this record. We conclude that no prejudicial error is shown in the admission of this evidence.

One of appellant's grounds for new trial is newly discovered evidence. A number of affidavits setting out the alleged newly discovered evidence were filed and presented to the trial court. All of the material facts stated therein are denied by counter affidavits filed and presented to the trial court, which were sworn to by witnesses who, so far as we can see, are equally credible with those making the affidavits in support of appellant's motion, though less in number. We have read all of these affidavits with considerable care, and putting aside the question of the evidence being in fact newly discovered, and the want of diligence in failing to discover it

and producing it upon the trial, we are clearly of the opinion that the trial court did not abuse its discretion in denying the motion.   We may observe that a considerable portion of this alleged new evidence touches matters which are not very material to the controversy, and a considerable portion of it, though not all, is little else than cumulative.   We assume that the trial court regarded it, as a whole, not likely to change the result upon a new trial.   We agree with such conclusion. *State v. Webb,* 20 Wash. 500, 55 Pac. 935; *Thayer v. Spokane County,* 36 Wash. 63, 78 Pac. 200; *Knapp v. Chehalis,* 65 Wash. 350, 118 Pac. 211.

The judgment is affirmed.

HOLCOMB, MOUNT, MAIN, FULLERTON, and ELLIS, JJ., concur.