CROSBY v. CUBA R. CO.

(Circuit Court, D. New Jersey. January 2, 1908.)

1. EVIDENCE—FOREIGN LAWS—JUDICIAL NOTICE.
    Courts do not take judicial notice of foreign laws, which, when relevant, must be pleaded and proved as facts.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 20, Evidence § 52.]

2. SAME—PRESUMPTIONS—FOREIGN LAWS.
    Where a servant sued his master in a federal court in the district of New Jersey for an injury sustained in Cuba, plaintiff was not required to allege that the Cuban law conferred a right of action for such injury; the burden being on the defendant to specially allege and prove the contrary if there was a conflict between the lex loci and the lex fori.
    [Ed. Note.—For cases in point, see Cent. Dig. vol. 20, Evidence, § 102.]

**3. MASTER AND SERVANT—ASSUMED RISK—DEFECTIVE MACHINERY.**

Where a servant complains of a defect in the master's machinery, and the master promises to repair, and requests the servant to continue with his work, the master assumes the risk, unless the peril is so grave and imminent that the servant cannot continue his work without being chargeable with negligence.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 638–640.

Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

**4. TRIAL—INSTRUCTIONS—APPLICATION TO EVIDENCE.**

Where a defect in machinery because of which a servant was injured did not render the machinery so dangerous that the servant was bound to abandon his work notwithstanding his master's promise to remedy the defect, or be chargeable with negligence. the court did not err in omitting to charge that the master would not assume the risk of injury from such defect if the danger was so imminent that no prudent man would continue to work with the machine in the exercise of ordinary care.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 46, Trial, §§ 596–612.]

**5. MASTER AND SERVANT—INJURY TO SERVANT—CONTRIBUTORY NEGLIGENCE.**

Plaintiff had charge of an engine equipped with a defective governor, which defendant had promised to repair. Just prior to the injury plaintiff was standing some distance from the engine, when it began to race, and plaintiff, seeing that another was unable to stop it, ran to his assistance, and was injured just as he got to the engine by the bursting of the pulleys above. *Held*, that plaintiff was not negligent in leaving his place and going to the engine.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, § 749.]

**6. DAMAGES—PERSONAL INJURIES—EXCESSIVENESS.**

Where plaintiff, an engineer 30 years of age, earning $1,500 a year, was so injured as to necessitate the amputation of his right hand, a verdict allowing him $6,000 was not excessive.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Damages, §§ 372–396.]

**7. MASTER AND SERVANT—INJURIES TO SERVANT—NEGLIGENCE.**

In an action for injuries to a servant by the bursting of a pulley caused by a defective engine which the master had promised but failed to repair, evidence *held* to require submission of the question of defendant's negligence to the jury.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, §§ 1010–1031.]

**8. COURTS—FEDERAL COURTS—CITIZENSHIP—PLEADING.**

Plaintiff's declaration alleged that he was a resident of the city of Dickson, in the state of Tennessee, and that defendant was a corporation organized under and by virtue of the laws of the state of New Jersey *Held* that, while such averment sufficiently alleged defendant's citizenship to sustain the jurisdiction of the federal court, the allegation of plaintiff's residence was not a sufficient allegation of citizenship.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 13, Courts, § 878.

Averments of citizenship to show jurisdiction of federal courts see notes to Shipp v. Williams, 10 C. C. A. 261; Mason v. Dullagham, 27 C. C. A. 303.]

**9. SAME—AMENDMENT.**

Where plaintiff's declaration filed in a federal court merely alleged that he was a resident of D., in Tennessee, and he testified that he lived "at present in Cuba," he might be granted leave after verdict to take depositions to establish his citizenship. and then amend the declaration so as to sufficiently show diversity of citizenship on which federal jurisdiction depended.

158 F.—10

**10. SAME—OBJECTIONS—WAIVER.**

> Where a federal court's jurisdiction depended on diversity of citizenship, and plaintiff's declaration did not sufficiently aver his citizenship, the court was bound to take notice thereof, though no objection was made thereto.

At Law. On rule to show cause why the verdict should not be set aside and the action dismissed or a new trial granted.

Benjamin M. Weinberg, for plaintiff.

Howard Mansfield, Henry De Forest Baldwin, and Charles E. Miller, for defendant.

LANNING, District Judge. The plaintiff in his declaration avers that on June 16, 1906, he was an employé of the defendant in its planing mill in the republic of Cuba; that the mill was furnished with an imperfect and defective steam engine; that on the date above mentioned the engine "ran away," thereby putting a severe strain upon the shafting and pulleys with which it was connected, and causing the pulleys to break and fly apart, and that one of the broken parts struck and injured the plaintiff's right hand so that it had to be amputated. He claims damages for the injury thus sustained, charging the defendant with negligence in supplying the mill with an imperfect and defective engine. The only plea filed is that of the general issue.

In the first place, the defendant insists that the court should set aside the verdict and dismiss the action because the plaintiff has neither alleged nor proven that under the law of Cuba he acquired any right of action against the defendant. Courts do not take judicial knowledge of foreign laws. When necessary to be considered, they must be proven as facts in the case. In Chartered Mercantile Bank of India v Netherlands India Steam Navigation Co., 10 Q. B. Div. 521, Lord Justice Brett, at page 536, in referring to the case of The M. Moxam, said:

> "In that case, whatever the cause of action was, it arose entirely in Spain, and the action was an action in tort; and the well-known rule applies that for any tort committed in a foreign country within its own exclusive jurisdiction an action of tort cannot be maintained in this country unless the cause of action would be a cause of action in that country, and also would be a cause of action in this country Both must combine if the tort alleged was committed within the exclusive jurisdiction of a foreign country."

The same rule is expressed by Dicey in his work on Conflict of Laws, p. 659. In Scott v. Lord Seymour, 1 H. & C. 219, and 1 English Ruling Cases, 533, Wightman, J., declared that since the case of Mostyn v Fabrigas, Cowp. 161 (copiously annotated in 1 Smith's Leading Cases [8th American Ed.] p. 1027), he was not aware of any rule of law that would disable a British subject from maintaining an action in England for damages against another British subject for assault and battery committed by him in a foreign country merely because no damages for such trespass were recoverable by the law of that foreign country, and without any allegation that such trespass was lawful or justifiable in that country. "By the law of England," said he, "an action to recover damages for assault and battery is maintainable; and whatever may be the case as between two

Neapolitan subjects, or between a Neapolitan and an Englishman, I find no authority for holding, even if the Neapolitan law gives no remedy for assault and battery, however violent and unprovoked, for recovery of damages, that therefore, a British subject is deprived of his right." Justices Williams and Crompton, however, expressly refrained from stating any opinion upon the point, for the reason that it was not necessary to the determination of the case, and Justice Blackburn expressed his doubt whether the rule had been correctly stated by Justice Wightman. Dicey, at page 662 of his work above referred to, says:

"It is hard to see why an Italian or an Englishman who assaults either an Italian subject or a British subject at Naples, and does not thereby incur, under the law of Italy, liability to the payment of damages, should become liable to pay them when an action is brought against him in England. Italian law imposes no such liability; and English law does not extend to Italy."

An action brought in one of our states for damages resulting from a common-law tort committed in another of our states may doubtless be maintained without proof of the lex loci; but, where an action to recover damages for a wrongful act committed in another state is maintainable solely under some statutory authority of that state, and not under the common law, there the statutes of the state conferring the right of action must be both pleaded and proven by him who asserts the right. See Wooden v. W. N. Y. & P. R. R. Co., 126 N. Y. 10, 26 N. E. 1050, 13 L. R. A. 458, 22 Am. St. Rep. 803, and Keep v. National Tube Co. (C. C.) 154 Fed 121. In the present case the right of action is not based on any statute of Cuba, and the defendant insists that the common law cannot be presumed to exist in Cuba, inasmuch as that country was formerly a Spanish colony. But, as above stated, the defendant has filed the plea of the general issue only. The declaration alleges what, according to the lex fori, is actionable negligence on the part of the defendant. The defendant by pleading the general issue has not denied the legal sufficiency of the allegations of the declaration. If the lex loci delicti does not give to the plaintiff a right of action, that defense should have been presented by a special plea, and supported by proofs offered by the defendant. I do not think it was obligatory on the part of the plaintiff to set forth in his declaration in express terms what the special law of the republic of Cuba on the subject of actionable negligence may be. He had the right to set forth a cause of action which, according to the law of the forum, would be complete, and, in the event of a conflict between the lex loci and the lex fori, the defendant ought to have shown by a proper plea that, under the lex loci, the plaintiff acquired no right of action.

In Scott v. Lord Seymour, supra, the declaration alleged that the defendant assaulted and imprisoned the plaintiff. The defendant pleaded, first, that the trespasses were committed at Naples, out of the jurisdiction of the court, and that, according to the law of Naples, the defendant was not liable to be sued by the plaintiff in any other civil action or other proceedings to recover damages for the alleged trespass. The second plea was to the effect that the trespasses were committed at Naples; that penal proceedings had been taken there; that

by the law of Naples the plaintiff could not recover damages in a civil action, or other proceeding in respect of the trespasses until the defendant had been condemned and found guilty of those trespasses; that at the time of the commencement of the suit the proceedings in Naples were still pending and undetermined; and that the defendant had not been condemned or found guilty of the trespasses or any part thereof. On a demurrer to the pleas they were held to be insufficient. Mr. Justice Wightman, concerning the first of these pleas, said:

"My learned Brethren are of opinion that the plea does not contain any averment that damages might not be recovered by the law of Naples for the alleged trespass in some form of proceeding or other, and that it may be taken as against the defendant in the action that the pleas admit that they might be recovered; and that, if that be so, the question is one of procedure merely and governed by the lex fori, and that there is nothing to oust the jurisdiction of an English court to entertain an action to recover damages in such a case. I agree with the rest of the court, if the construction of the first plea is that which they suggest."

It will be observed that it was not suggested that it was the duty of the plaintiff to allege and prove the lex loci; that is, the law of Naples. That seems to have been regarded as matter of defense to be averred and proven by the defendant. It is a well-settled rule of pleading that, if a court has not general jurisdiction of the subject-matter of an action instituted before it, the defendant ought to plead to the jurisdiction, and that he cannot take advantage of it upon the general issue. It was so declared by Lord Mansfield in the leading case of Mostyn v. Fabrigas, supra.

In Dainese v. Hale, 91 U. S. 13, 23 L. Ed. 190, it appears that an action ex delicto was brought in the Supreme Court of the District of Columbia to recover the value of chattels which the defendant, as consul general of the United States in Egypt, there caused to be attached. The defendant pleaded that as such consul general he was invested with judicial functions and power in the case, and that in the exercise of those functions he took cognizance of the cause referred to in the declaration, and issued the attachment complained of. To this plea there was a general demurrer. The demurrer was overruled. The parties to the action before the consul general were all citizens of the United States. Mr. Justice Bradley, after reviewing the acts and treaties relevant to the questions involved, and after reaching the conclusion that under those acts and treaties the consul general had such jurisdiction in civil causes between citizens of the United States as was permitted by the laws of Turkey, or its usages in its intercourse with other Christian nations, said:

"But here we are met by a difficulty arising from the extreme generality of the defense set up in the plea. What are the laws of Turkey and its usages in its intercourse with other Christian nations in reference to the powers allowed to be exercised by their public ministers and consuls in judicial matters? The plea does not inform us. It leaves the court to infer or take judicial knowledge of those laws and usages. But can it do this? Foreign laws and usages are, as to us, matters of fact and not matters of law. * * * As the power of the consuls of the United States, according to the treaties and laws as they stood in 1864, depended on the laws or usages of Turkey, those laws or usages should have been pleaded in some manner, however briefly, so that the court could have seen that the case was within them; for, fail-

ing to do this, the plea was defective in substance, and judgment should have been rendered for the plaintiff on the demurrer."

In The Scotland, 105 U. S. 24, 29 (26 L. Ed. 1091), Mr. Justice Bradley said that if a collision between British ships should occur in British waters, and the injured party should seek relief in our courts, we would administer justice according to the British law, so far as the rights and liabilities of the parties were concerned, provided it were shown what that law was, and that, if it were not shown, we would apply our own law to the case.

In Ackerson v. Erie Railway Co., 31 N. J. Law, 309, the action was brought in the New Jersey Supreme Court by the plaintiff against the defendant to recover for injuries received in a railroad accident on the defendant's railroad in the state of New York. The declaration was in the usual form, and, being demurred to, the question raised was whether the plaintiff could maintain his action in New Jersey. The right of action was sustained on the settled principle that "personal injuries are of a transitory nature and sequuntur forum rei."

In my judgment the objection that the plaintiff did not plead or prove what the law of Cuba is, is an invalid objection.

In the next place, it is urged that the verdict should be set aside and a new trial granted because of error in the charge of the court to the jury. In the course of the trial the plaintiff testified that, shortly after he entered the employment of the defendant, he noticed that the governor of the engine sometimes failed to work properly, and allowed the engine to run too fast. The first time he noticed it was probably three or four weeks after he entered the defendant's employment. He notified Mr. Knight, the master engineer and superintendent of the defendant's mechanical department, of the defect. The same trouble with the governor was observed by the plaintiff some three or four times within the period of six or seven months before the date of the accident. Each time the defect was reported by him to Mr. Knight. He says he explained to Mr. Knight on these different occasions that the governor was not working properly, and that it allowed the engine to run too fast. On Friday morning, June 15, 1906, the same difficulty occurred again. The governor failed to cut off the steam supply at the proper time, with the result that the engine "ran away," causing a vibration of the machinery and the raising of dust. The plaintiff says he notified Mr. Knight on that morning that the governor was not working right. Being further examined as to what took place on that morning, the record shows the following questions and answers:

"Q. Now, come down to Friday, this Friday after you noticed something the matter with the engine you say you notified Mr. Knight. What did you tell Mr. Knight? A. I told Mr. Knight that the governor was not working properly, and I was afraid it would cause trouble and an accident, and the shafting and pulleys would not stand from the speed it was running, I was afraid.

"Q. And what reply did you get to that, if any? A. He said he thought there was no danger, that the governor was worn out, and that they would replace it with a new governor.

"Q. Tell us all that you said to Mr. Knight, and that he said to you on this Friday, the day before the accident. Where did you find him in the first

place? A. I found him over in the engine house at 9 o'clock or 10 o'clock in the forenoon. * * *

"Q. Tell us all that you said to him and he to you, as near as you can recall it. A. Well, I told him that the governor was not working right this morning again, and that I was afraid that it would cause trouble or an accident, and that the shafting and pulleys would not stand the speed when it was turned loose that way, and he said that the governor was worn out, and he would have it thoroughly overhauled or replace it with a new one as soon as possible; that the governor would have to do until they could do that, or had time to repair it. He told me to go on and do the work, that he didn't think there was any danger, and that he thought the pulleys and shafting would stand until they replaced the governor.

"Q. Go ahead, tell us the whole story. Was there anything further? A. No, sir; I think that was all.

"Q. What did you do then? A. I went back to my work.

"Q. You went back to your work? A. Yes, sir."

In the course of the charge to the jury, after referring to the above testimony, I said:

"If you believe that that statement of the plaintiff is free from error, that there is no mistake about it; if you think he is telling the truth, the exact truth, and made no mistake in that respect, then the law is that the obvious risk which up to that moment had been his was lifted from his shoulders, because the man in charge of the business, who was the representative of the defendant company, to whom he was authorized to report, said to him, 'You go back to your work, and I will have the thing attended to.' If this was what took place, and what Mr. Knight said, then the defendant company assumed the risk and lifted it from the plaintiff's shoulders for a reasonable period—that is, for such a period as would be a reasonable time for the defendant to make repairs to the governor—and after the expiration of that reasonable period, if the plaintiff continued to work there without repairs, then the risk was revived as against him, and he assumed it again. You therefore have to settle on this branch of the case the question as to whether a reasonable time for repairing that governor had expired before the accident happened. You remember that the plaintiff says that he reported to Mr. Knight the defect in this governor on Friday morning, I think it was about 9 o'clock, and it appears that the accident happened about 2 or 3 o'clock the next afternoon, which was something over 24 hours afterwards. Ought the governor to have been repaired within that time? Had the reasonable time expired? If so, then no matter if Mr. Knight did make the promise that the plaintiff said he made on Friday morning, the obvious risk had revived as against the plaintiff, and he cannot recover, and you must conclude that he is guilty of contributory negligence."

Abstractly considered, the language of the charge above quoted stated too broadly the rule as to the shifting of the risk of obvious danger from the servant to the master where the servant continues to work with a defective machine after a promise by the master to have it repaired, and a request by the master to the servant to continue with his work. It is true that, even where a master requests his servant to continue his employment with a machine rendered dangerous by reason of its defects, the danger may be so grave and so imminent that no prudent man can continue to work with the machine without being guilty of contributory negligence. But, after reflection, I have reached the conclusion that the language of the charge above quoted, as applied to the facts of the case in hand, is not objectionable. Ordinarily a servant assumes the risks of danger which are obvious to him because of an implied agreement between him and his master. But if those obvious risks are due to defective machinery, and he complains of the

defect to his master, and the master promises to have the defect remedied, and requests him to continue with his work, the implication is that until the promise is executed, or until the time within which it should be executed has expired, the master assumes the risks, unless, indeed, as above stated, the peril is so grave and imminent that the servant cannot continue his work without being guilty of contributory negligence. But, while it is true that the plaintiff in the present case had the day before the accident said to Mr. Knight that he was afraid there would be "trouble or an accident," the engine had run away several times before without injury to any one. The testimony shows that he was charged with the duty of starting and stopping the engine. It also shows, and on this point there is no dispute, that Mr. Knight requested him to continue with his work, and that Mr. Knight did not think there was any danger in his doing so. I think the case is barren of any evidence showing, or tending to show, that the peril to the plaintiff was so great that he was either bound to abandon his work, and thereby, perhaps, cause the operations of the mill to be suspended until some other person could be secured to fill his place, or, in the event of injury to himself, be held remediless because of his contributory negligence. As I view the case, the rule of Andrecsik v. New Jersey Tube Co., 73 N. J. Law, 664, 63 Atl. 719, 4 L. R. A. (N. S.) 913, and Dowd v. Erie Railroad Co., 70 N. J. Law, 451, 57 Atl. 248, was properly applied. I think, also, that there was nothing in the charge, as applied to this case, that can be held to be contrary to District of Columbia v. McElligott, 117 U. S. 621, 6 Sup. Ct. 884, 29 L. Ed. 946; Roccia v. Black Diamond Coal Mining Co., 121 Fed. 451, 57 C. C. A. 567; Cincinnati, etc., v. Robertson, 139 Fed. 519, 71 C. C. A. 335; or Crookston Lumber Co. v. Boutin, 149 Fed. 680, 79 C. C. A. 368.

It is also urged that the court erred in not charging the jury, as requested by the defendant, that:

"If the jury find that the plaintiff put himself in the way of the racing engine with knowledge of its character, the verdict must be for the defendant."

There was no evidence that the plaintiff put himself in the way of the racing engine, unless it be his own testimony. He says that on the afternoon of June 16th he was in the filing room when the engine broke loose and began to run away. His place in that room was about 70 feet distant from the engine, and he could see it from where he stood. He says that as he looked over to the engine he saw Mr. Bonet standing by it, evidently trying to stop it, and that, as Mr. Bonet did not seem to be succeeding in his efforts, he, the plaintiff, ran over to see if he could stop it. Just as he got to the engine, the pulleys overhead burst, and a piece of one of them struck his hand, causing injury which necessitated its amputation. To hold the plaintiff guilty of contributory negligence in such circumstances, it seems to me, would be most unreasonable. He was the man who had charge of the engine, and in his effort to protect property and life he rushed to the engine to stop it. His action was commendable, and in the discharge of a plain duty, and under no circumstances could there be from such conduct the inference of contributory negligence.

The defendant contends, too, that the verdict is excessive. It was for $6,000. The plaintiff is 30 years old. At the time of the accident he was earning $125 per month, or $1,500 a year. In Dowd v. Erie Railroad Co., supra, the plaintiff lost his right hand. He was 38 years old and earned only between $8 and $9 a week. The verdict was for $5,500. The court said:

"We cannot say that the damages are excessive. It is said that $5,500 paid to a man 38 years old and invested at 5 per cent. would produce an annuity for his life of $379, an amount about equal to his earnings. It is not contended that $5,500 would buy an annuity of that amount, and, in view of the prevailing rate of interest, it is hardly likely that the plaintiff could count upon as high a rate as 5 per cent. This calculation leaves out of account any compensation for pain and suffering. The loss of a right hand to a laboring man in the prime of life is a very serious loss, and an award of $5,500 does not, to say the least, seem so extravagant that the court would be justified in interfering with the verdict."

My conclusion is that the verdict cannot be disturbed on the ground that it is excessive.

Lastly, it is said that the verdict is contrary to the weight of evidence and to the law. I have said all that need be said on the point, as to whether it is contrary to law. As to whether it is contrary to the weight of evidence, I am satisfied that the case was a fair one for the jury, and that the verdict cannot be disturbed on that ground.

But the jurisdiction here depends upon proper diversity of citizenship. It is essential that such citizenship be affirmatively averred. In his declaration the plaintiff avers that he is a "resident of the city of Dickson, in the state of Tennessee," and that the defendant is "a corporation organized under and by virtue of the laws of the state of New Jersey." There is no other averment as to the citizenship of either of the parties. The plaintiff testifies that he lives "at present in Cuba." There is no other proof on the point of his citizenship. The averment that the defendant is "a corporation organized under and by virtue of the laws of the state of New Jersey" has been held to be in legal effect an averment that it is a citizen of the state of New Jersey. Block v. Standard Distilling & Distributing Co. (C. C.) 95 Fed. 978. But the averment that the plaintiff is a "resident of the city of Dickson, in the state of Tennessee," is insufficient. An averment of residence is not the equivalent of an averment of citizenship for the purpose of securing jurisdiction in the courts of the United States. Wolfe v. Hartford Life Insurance Co., 148 U. S. 389, 13 Sup. Ct. 602, 37 L. Ed. 493. Although this defect in the declaration was not referred to on the argument of this rule, the court cannot overlook it. In Horne v. George H. Hammond Co., 155 U. S. 393, 15 Sup. Ct. 167, 39 L. Ed. 197, where the allegation was in substance the same as in the declaration in the present suit, the judgment of the trial court was reversed on the sole ground that the transcript of the record did not show that the trial court had jurisdiction of the suit. But I do not think I ought to dismiss the case at present on this ground. I have no reason to believe that proper diversity of citizenship does not in fact exist. Opportunity should be given to the plaintiff to show such diversity, and to amend his declaration if the facts will warrant the amendment. The court has the power, at any stage

of the case, to make inquiry concerning the citizenship of a party. Hartog v. Memory, 116 U. S. 590, 6 Sup. Ct. 521, 29 L. Ed. 725. The plaintiff may enter a rule to take depositions on this point, with leave to the defendant to take answering depositions thereto. After such depositions are taken, application may be made to the court, for leave to amend the declaration. Instead of adopting this course, however, if the defendant shall, after inquiry, be satisfied that such diversity of citizenship exists as gives jurisdiction to the court, the declaration may be amended on the defendant's consent, and thus save the time and expense of taking depositions.

The entry of judgment upon the verdict must be postponed until after the question concerning the amendment of the declaration shall have been decided.