**In re LEE TRANSIT CORPORATION.**

**Ex. parte NELSON.**

Circuit Court of Appeals, Second Circuit.
January 6, 1930.

No. 162.

David M. Fink, of New York City (Jacquin Frank, of New York City, of counsel), for appellant.

Single & Single and Paul D. Compton, all of New York City, for appellee.

Before L. HAND, SWAN, and MACK, Circuit Judges.

L. HAND, Circuit Judge. ■ Nelson, the claimant, served as a deckhand on the appellee's tug. On a cold February day, 1926, the tug took in tow two barges tandem in the East River to land them, or at least one of them, on the south side of the Oak street pier some two miles further up the river. The barges were made fast close together on hawsers to the tug about twenty fathoms long. The Oak street pier extends some four hundred feet out from the Brooklyn bulkhead line and to the south there is open water for more than a thousand feet. In making her landing on a flood tide the tug did not round to outside and above the pier, but came in on the current at an improper speed; so the judge found and the appellee, not having filed any assignments of error, is concluded by the finding. One hawser led from the port corner of the nearest barge to the port bitt of two bitts which stood side by side at the stern of the tug, just abaft the housing, and some ten or fifteen feet forward of the fantail. The other led from the starboard corner to the starboard bitt.

■ As the tug approached it was necessary to check the momentum of the barges; the tug slackened her speed and both hawsers were thrown off. Nelson swore that he cast off the port line, and that the cook, who had come aft from the galley to act as deckhand, cast off the starboard. The cook swore that he cast off the port line himself, and that the starboard line was already on the deck when he got aft. In any event both agreed that the cook picked up one line and went forward to a starboard side bitt some feet forward of the after part of the housing and made or tried to make several turns so as to check the advance of the barges which by that time lapped the stern of the tug. The cook said that having made "about" two turns, the slack behind him got fouled. Upon going aft to see what was the trouble, he found that Nelson had taken a turn of the port line around the port after bitt, and being unable so to hold the barges, had got his foot caught in a kink as the line paid out. Being unable to extricate himself, his foot was torn off when it reached the bitt, the barges continuing to move forward towards

the bulkhead. Nelson's version was that the cook, having thrown off the starboard line, carried it forward to the starboard bitt. Seeing him unable to take any turns and hold the barges, Nelson tried to check them by taking three turns upon the port after bitt with the port line, but with the result above described.

The judge mistakenly supposed that Nelson had sworn that he handled the starboard line with which he took his turns about the port after bitt. Ignoring this supposed testimony, he found that he had used the port line upon that bitt, as in fact every one conceded, and found him guilty of negligence, because he had so interfered with the cook's work. For this reason he reduced his recovery, the suit being under the Jones Act (46 USCA § 688), and this is the ground of Nelson's appeal. We cannot say that the judge's error did not affect his finding; it established an apparent contradiction of Nelson on a material question, discredited his story, and may well have turned the scale against him. We regard ourselves as free therefore to determine the case upon the evidence, and we think that the appellee has failed to carry the burden of proof.

As between the two versions it is difficult to choose. The fireman corroborated Nelson in saying that he had got three turns, not one, around the port after bitt with the port line and that the cook was using the other line, and though Nelson had great interest in making a case the fireman had not. The cook was not without interest either, since unless Nelson interfered with him he had failed in his work. Even if his line fouled, it does not necessarily mean that Nelson had made it fast. The lines had been in cold water, taken in hastily and were uncoiled; the slack may well have become tangled or caught upon the after gear. Had the cook made two turns and Nelson three on the same line, it would not have slipped. Nelson was afraid to take more as it was, lest it should break. No doubt the port line was the better one to use, as the barges were coming up on the starboard side; but there was not much to choose, and the cook might well have taken the starboard line if handier. The facts are therefore very uncertain.

It appears to us incredible that Nelson should have made fast a line on which he knew the cook was still at work; action which every one, himself included, condemned. He said that the cook had missed his catch, and this is apparently not true,

but he may have mistaken the continued paying out of the line for a miss, not seeing exactly. If so, the worst which we can impute to him is that he wrongly assumed from where he was that the cook had failed. That, if a fault at all, was venial; for if he was to act, it must be at once, and that too without opportunity to verify his conclusion. On no theory therefore does it seem to us that the appellee has shown him guilty of bad seamanship. Even if he were, it is hard to see how his error added any risk to his handling of the lines at all in the emergency that he supposed to exist.

The appellee argues therefore that it was in any event dangerous for him to try to stop the barges with the line which he used. We agree that it was somewhat hazardous to intervene, assuming as we must that the barges were moving with considerable speed; we may even concede that a volunteer would not have been justified in so exposing himself, but we cannot agree that an employee in his position was legally at fault.

There are a number of cases in the books dealing with such a situation, and it must be confessed that the law is not clear. We pass those decisions in which life is at risk, since here the question was only of property. No doubt the standard always must be the proper balance between the risk to life or limb and that to the property, and this of course involves the imminence and gravity of the possible injury and of the possible damage. A servant certainly may not greatly hazard his safety for a trifle; it does not follow that he may not incur a slighter chance to protect property of value from present danger. The real question is whether his relation as employee justifies more disregard of himself than if he had no duty to perform. It is on this issue that the cases appear not to be in entire accord. There are a number which take into consideration the relation, apparently excusing in an employee conduct which would bar a volunteer. Crosby v. Cuba R. Co. (C. C.) 158 F. 144, 151, affirmed sub silentio, 170 F. 369 (C. C. A. 3); Winczewski v. Winona Ry., 80 Minn. 245, 83 N. W. 159; Pennsylvania Co. v. McCaffrey, 139 Ind. 430, 38 N. E. 67, 29 L. R. A. 104; Schall v. Cole, 107 Pa. 1; Kelley v. Chicago, M. & St. P. Ry. Co., 50 Wis. 381, 7 N. W. 291; Harding v. Ostrander, 64 Wash. 224, 116 P. 635; Prophet v. Kemper, 95 Mo. App. 215, 68 S. W. 956; Consolidated Kan. City, etc., Co. v. Taylor, 48 Tex. Civ. App. 605, 107 S. W. 889. At times the distinction is recognized, though the facts

do not justify the action taken. Chattanooga, etc., Co. v. Hodges, 109 Tenn. 331, 70 S. W. 616, 60 L. R. A. 459, 97 Am. St. Rep. 844. In Pegram v. Seaboard Air Line, 139 N. C. 303, 51 S. E. 975, 4 Ann. Cas. 214, the ratio decidendi is not clear; in Condiff v. Kan., etc., Ry., 45 Kan. 256, 25 P. 562—now a somewhat old case—only danger to life is recognized. Maltbie v. Belden, 167 N. Y. 307, 60 N. E. 645, 54 L. R. A. 52, certainly suggests that the same was true in New York, but a recent case, Wardrop v. Santi Moving Co., 233 N. Y. 227, 135 N. E. 272, involving the protection of the plaintiff's property, admits "a reasonable effort" to protect that alone. Judkins v. Maine Central, 80 Me. 417, 14 A. 735, went on the ground that the plaintiff was in any case foolhardy, and so also we are disposed to read Elliott v. Chicago, M. & St. Paul Ry., 150 U. S. 245, 14 S. Ct. 85, 37 L. Ed. 1068. No one of course supposes that an employee is excused no matter how great his carelessness. Illinois Cent. Ry. v. Evans, 170 Ky. 536, 186 S. W. 173, involved the protection of life as well as property.

The upshot is that there is a substantial body of authority which excuses an employee in accepting dangers which would bar a volunteer. Whether his duty exonerates him further than the interest of an owner in his property we have not to say; perhaps not. What hazards he may safely incur it is indeed idle to try to define; the best one can do is to invoke the supposititious standard of one who is at once faithful but not foolhardy; of a "reasonable" servant so circumstanced. Such a one it seems to us would not have hesitated to do as Nelson did, provoked by the danger he observed to his master's property. In the long run employers will not profit by anything less; they may indeed be called upon to pay for injuries which they otherwise would not, but it is certainly not in their interest to dampen the loyalty of their servants. Nor indeed if it were, would that necessarily be the test, since in such matters the real appeal is to the average opinion as to what conduct is proper. Nobody can doubt that the ordinary man would commend in others—whatever he might do himself—a disposition in the discharge of duty to take chances which would not otherwise be excused.

We do not know what damages the learned District Judge found, and if the value of the tug is correctly stated in the limitation petition, $7,080, we need not consider the question, since the recovery must at least be as much. Against the possibility that she may prove to be worth more, we fix the damages at $11,000, and with them the amount of the claim. Nelson is now employed at eighty dollars a month; formerly he earned ninety dollars and was found. We take the difference to be about six hundred dollars a year. The present value of such an annuity at the age of thirty-seven is about eighty-five hundred dollars, his expectancy of life being thirty years. It is not likely that he could have worked so long, and if we are to take twenty-three years as his probable expectancy of active work we shall not be far wrong. Without attempting any nice calculation we think, as the later payments are most discounted, that $7,000 is as close a figure as the evidence admits. We add $4,000 for his mutilation.

Decree modified by raising the award to $11,000.