**JENNINGS v. CHICAGO, R. I. & P. RY. CO.**

District Court, D. Minnesota, First Division.
Sept. 11, 1930.

O'Brien, Horn & Stringer, of St. Paul, Minn., for defendant.

Tautges, Wilder & McDonald, of Minneapolis, Minn., for plaintiff.

SANBORN, District Judge.

The suit, which is one for damages for personal injuries caused by alleged violation of the Boiler Inspection Act, was tried at Winona, Minn., on June 19th of this year, and resulted in a verdict for the plaintiff of $42,500. The defendant claims that the verdict is so excessive as to require a new trial unless a reduced amount is accepted. The plaintiff contends that the verdict was not as large as it might well have been.

Under the rule in Public Utilities Corporation v. McNaughton (C. C. A.) 39 F. (2d) 7, if a verdict is so excessive as to be erroneous, the correction of the error lies with the trial court upon a motion for a new trial and is not subject to review by the Court of Appeals, unless, possibly, where the overruling of such a motion is claimed to be an abuse of discretion. It is no more the province of this court, however, to weigh the evidence or determine the credibility of the witnesses, than it is of the appellate court, and the only question to be considered is whether there is substantial evidence to sustain the amount of the verdict.

If a verdict in a personal injury case is in excess of what could fairly be said to be sustained by substantial evidence, taking the view of it most favorable to the plaintiff, then it, or at least so much of it as is unsupported, is attributable to passion, prejudice, or sympathy on the part of the jury. Courts have properly tried to keep verdicts in cases such as this within the bounds of reason and to some extent in harmony with verdicts in similar cases tried in the same state or district.

Jennings had been employed by the defendant company since 1902. At the time of the accident—on November 26, 1928—he was an engineer with seniority rights, dating from 1910, which were sufficient to keep him regularly employed, and his earnings were, on an average, something more than $300 a month. He was then 48 years of age and a strong, well man. On that day he was operating an engine. The reach rod broke, causing the reverse lever to fly backwards and strike him on his left leg between the hip and knee, and causing a compound comminuted fracture of the thigh bone. In an unsuccessful attempt to save his leg, he was kept in the hospital for more than six months in Pratt, Kan., and during that period suffered intense pain. The leg became infected; he was delirious for a considerable portion of the time, and was given opiates. On May 30, 1929, he was taken to Chicago for examination by the defendant's chief surgeon. On the 17th day of July, 1929, it was determined that his leg could not be saved, and it was amputated at a point which leaves a sufficient stump to permit the use of an artificial leg. The injury and subsequent treatment resulted, naturally, in loss of weight, strength, and appetite, and produced nervousness and inability to sleep. There was an infection in the stump after amputation, and Jennings was not discharged from the hospital until September 7, 1929. About September 11, 1929, a slight operation was performed on the stump by the defendant's surgeon at Pratt, Kan., and some pus was drained off. There was still some slight draining from the stump at the time of trial, showing that at that time some infection was still present. This infection and the fact that the stump was not in suitable condition for the use of an artificial limb made it difficult, if not impossible, for Jennings to use one at the time of the trial. There is a dispute in the testimony of the experts as to whether he ever will be able to use comfortably an artificial leg, and it seems to be conceded that he will need some further operation on the stump before he can do so. Such an operation would perhaps not incapacitate him for long and would cost not to exceed $400. I think a finding that he could never use an artificial leg would not be justified by substantial evidence.

There is no claim that Jennings was able to work at any gainful occupation prior to the time of the trial, which was approximately nineteen months after his injury, and it could be reasonably concluded that it would be some time more before he could work. To the time of the trial, his actual loss in earnings was about $6,000. While it was contended by the defendant that, with an artificial limb, the plaintiff could resume his duties as an engineer, it was not claimed that he could secure employment with any other railroad company than the Rock Island, nor that he could secure employment with it after having brought this action. He may be required to pay out $400 more for medical and surgical attention and has paid $225 for an artificial leg. On the other hand, the defendant company advanced him $1,300 prior to the trial.

Just what should be allowed Jennings for pain and suffering from the time of the accident up to the time that his leg was amputated, and for such pain and suffering as he sustained after that time, is difficult of ascertainment, and is a matter about which no two persons would be likely to agree. In addition to that, there is the embarrassment and discomfort which will follow throughout his life because of his mutilation. In Re Lee Transit Corporation, 37 F.(2d) 67, the Circuit Court of Appeals of the Second Circuit allowed a seaman, who had lost his foot, $4,000 for his mutilation, in addition to his loss of earnings. The loss of a leg, being a very much more severe injury than the loss of a foot, would justify a larger amount of damages.

Jennings' life expectancy is about 20 years. If he were to spend $25,000 for the purchase of an annuity, he would receive approximately $150 a month. It would not be entirely fair to estimate the amount due for loss of future earnings upon an annuity basis (since insurance companies calculate interest earnings at a very low rate of interest, 3 per cent. or 3½ per cent., I believe) although that seems to have been the basis used by the Court of Appeals of the Second Circuit in the case above cited, in which it said (37 F.(2d) 67, 69): "The present value of such an annuity at the age of thirty-seven is about eighty-five hundred dollars, his expectancy of life being thirty years."

There is no way of determining with any degree of accuracy how much Jennings' earning capacity has been diminished by the loss of his leg. He is a man of little education, although intelligent and alert. His entire active life has been devoted to railroading. What such a man could earn in any other occupation must be very largely a matter of conjecture. There is not a great deal that he could do in the way of manual labor, and the number of occupations in which he could engage would not be large. His experience with steam locomotives should be of some value to him in securing employment, possibly as a stationary engineer, a boiler inspector, or some similar occupation having to do with steam apparatus. The circumstances of the case are unusual. Jennings had a larger earning capacity than the plaintiffs in most of the reported cases. The amount of pain and suffering caused by the injury was unusual. The maximum amount which a jury might properly award him as damages, under the evidence, cannot be determined with any degree of certainty, and must be largely a matter of judgment.

In the case of Wolf v. C., M., St. P. & Pac. R. Co. (Minn.) 230 N. W. 826, 829, reversed for reasons other than the size of the verdict, it appeared that the plaintiff, a conductor of a switching crew, lost his right leg four inches above the knee, lost a bridge in his lower jaw and the teeth in his upper jaw. Of the $32,500 verdict returned by the jury, the court said: "The result was a verdict larger than any which has so far been allowed to stand in this court for injuries of similar gravity." In some districts larger awards are permitted to stand than in others. This, perhaps, is due in part to the attitude of the courts and also to a difference in the estimated value of a dollar. See Hammond v. Pennsylvania R. Co. (D. C.) 15 F.(2d) 66, in which a verdict of $77,-000 was reduced to $47,000; and Bosher v. International Ry. Co. (D. C.) 15 F.(2d) 388, in which a $54,000 verdict was reduced to $45,000. Many cases are compiled in "Damage Verdicts" by Parmele, vol. 1, p. 692 et seq.

It is my best judgment, from a consideration of the cases and from what I know of verdicts in cases tried in this state and district bearing some similarity to this, that $36,000 would be the maximum amount which could be sustained under the evidence in this case. That would give to Jennings $6,000 for his lost earnings to the date of trial, and $30,000 for present value of future earnings and other elements of damage. The $1,300 which had been already advanced to him by the defendant should more than cover any additional surgical treatment needed and the purchase price of his artificial leg. A $36,000 award means an actual recovery of $37,300, and, while that is, perhaps, larger than any verdict in a similar case in this state which has been permitted to stand, the case is an unusual one, as has been pointed out.

If the plaintiff, within twenty days, files his consent to a reduction of the verdict to $36,000, the motion for a new trial is denied; otherwise, a new trial will be ordered.